**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BLOOMBERG FINANCE L.P.,

                    *Plaintiff*,

          -v-

UBS AG,

                    *Defendant*.

Case No.

**COMPLAINT**

**JURY DEMANDED**

---

Plaintiff Bloomberg Finance L.P., by its attorneys, Quinn Emanuel Urquhart & Sullivan,

LLP, for its Complaint against Defendant UBS AG, alleges as follows:

<u>**NATURE OF ACTION**</u>

1.      Bloomberg Finance L.P. ("BFLP" and, together with Bloomberg L.P. and its

affiliates, "Bloomberg") is a leading provider of high quality financial market data.  Bloomberg

brings this action to recover damages for, and to obtain injunctive relief to prevent, the

unauthorized use and dissemination of Bloomberg's proprietary financial data by UBS AG

("UBS") in violation of various written agreements between the parties.

2.      Bloomberg spends enormous resources collecting, screening, curating, and

normalizing information relating to millions of financial instruments in a variety of industries

and asset classes.  The results of this painstaking and expensive process are a set of highly

valuable proprietary data compilations that Bloomberg makes available to its customers via

various licensing arrangements, each subject to written contractual terms and conditions.

3.      A Bloomberg Terminal® subscription allows individual users to view, access, and

interact with Bloomberg's data.  A Bloomberg data license allows an institution to access and

use licensed data within that institution's own internal applications and systems. In either case, a licensee's use of Bloomberg data is subject to contractual restrictions.

4.      In particular, both Bloomberg Terminal licenses and Bloomberg data licenses contain the fundamental requirement that the licensee not use the licensed data in any manner that would result in the licensee effectively becoming a source of or a substitute for Bloomberg's proprietary data, or in any manner that would result in the licensee competing with Bloomberg.

5.      Bloomberg and UBS are parties to two data license agreements executed in 1998—one permitting request-by-request access to proprietary data, the other covering bulk delivery of specified data sets.

6.      In 2005, the parties amended the two 1998 Bloomberg data license agreements to allow the use of a subset of the licensed data "within" certain applications developed by UBS. Critically, the 2005 amendment expressly reaffirmed the bedrock provisions of customary Bloomberg licenses, contained in the parties' 1998 licenses and referenced above, that expressly bar any external use of the data that would serve as a source of, or substitute for, the data itself. In other words, under the agreements at issue, UBS, like all Bloomberg customers, cannot convey Bloomberg's highly valuable, proprietary data directly to its own customers in a manner that would tend to obviate the customers' need to purchase their own Bloomberg license, because of the serious harm such unauthorized use poses to Bloomberg's core business.

7.      During the course of a 2017 investigation of UBS's misuse of other Bloomberg services arising from a sale of technology and transfer of employees from UBS to StatPro Group Plc ("StatPro"), Bloomberg discovered that—contrary to the terms of the 1998 licenses and the 2005 amendment—UBS was allowing its clients to access and download a vast trove of proprietary Bloomberg data through a UBS product known as "UBS Delta."

8.      By allowing its customers to download data from UBS Delta, UBS has effectively created both an alternate source of, and a substitute for, Bloomberg's data, allowing UBS customers to obtain the benefit of Bloomberg's labor and expertise without obtaining the necessary data license or paying Bloomberg the requisite fee.

9.      Despite Bloomberg's repeated requests, as well as its formal termination of the relevant provisions of the 2005 amendment, UBS has—for five months—refused to stop the contractually prohibited distribution of Bloomberg data through UBS Delta.  Nor has UBS provided information sufficient to demonstrate that it has stopped misusing Bloomberg's data.

10.     Instead, on July 2, 2018, UBS informed Bloomberg that it was replacing Bloomberg as a source of data for UBS Delta, effective August 2018.  Bloomberg does not contest UBS's right to replace Bloomberg as a source of market data for UBS Delta.  However, in light of UBS's conceded past and ongoing violations of the Global Agreements, and its persistent refusal to provide sufficient information regarding any efforts to halt that misuse, Bloomberg believes that in the process of replacing Bloomberg as a source of data within UBS Delta, UBS will disclose Bloomberg's data to Bloomberg's competitors, or will provide those competitors with information about Bloomberg's data, that would allow the competitors to "validate" or otherwise improve their own data, resulting in irreparable harm for which money damages are an insufficient remedy.

11.     Bloomberg therefore brings this action to obtain redress for UBS's past and ongoing breaches, and to obtain injunctive relief to prevent against a future breach, of the parties' written agreements.

## THE PARTIES

12.      Bloomberg Finance L.P. is a Delaware limited partnership with its principal place of business in New York, New York.  BFLP's general and limited partners are domiciled in the United States.  Bloomberg L.P. acts as operating agent for BFLP.

13.      UBS AG ("UBS") is a Swiss joint-stock company with its principal place of business in Switzerland.  Pursuant to the International Banking Act of 1978, 12 U.S.C. § 3101 *et seq*., UBS operates a Federal Branch at 299 Park Avenue, New York, New York.

## JURISDICTION AND VENUE

14.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the dispute is between a citizen of the United States and a citizen of a foreign state and the matter in dispute exceeds the sum or value of $75,000 exclusive of interest and costs.

15.      This Court has personal jurisdiction over UBS because, among other things, UBS transacts business in, and has substantial contacts with, New York.  UBS also purposefully availed itself of doing business with Bloomberg, which has its principal place of business in New York, and it expressly submitted to the jurisdiction of the courts of the State of New York in the relevant agreements.  *See* N.Y. Gen. Oblig. Law § 5-1402.

16.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), or, in the alternative, pursuant to 28 U.S.C. § 1391(b)(3).

## ALLEGATIONS

### Bloomberg's Proprietary Data and Licensing Business

17.      Founded in 1981, Bloomberg is a leading provider of financial market data, offering access to curated, high quality market and reference data for over 50 million instruments across a range of asset classes, such as fixed income and equities.

18.     There is no single standard by which the issuers of these millions of instruments publish relevant market and reference data.  Accordingly Bloomberg, like other market data providers, uses a unique and proprietary set of methods and processes to aggregate, organize, and curate financial data.

19.     Any Bloomberg client that wishes to receive Bloomberg's proprietary data so that the data can be used on an enterprise-wide basis outside of the Bloomberg Terminal environment is required to execute one of two types of Bloomberg Data License agreements.

20.     Under a "Per Security" license agreement, Bloomberg licenses the use of market data on a request-by-request basis in return for a per-request fee.

21.     Under a "Bulk Data" license agreement, Bloomberg licenses the use of datasets that Bloomberg makes available for download in return for a monthly recurring charge.

22.     Bloomberg's proprietary data is subject to strict usage restrictions designed to protect Bloomberg's property rights in the data and the expense of time and effort Bloomberg incurs to aggregate and curate the data.

23.     The fundamental restriction contained in every Bloomberg data license agreement is a prohibition on redistribution of Bloomberg data to third parties.  Without this provision, a single customer could undermine Bloomberg's business by sharing any or all of Bloomberg's valuable data with an unlimited number of third parties.

**The Bloomberg-UBS Data License Agreements**

24.     Bloomberg and UBS are parties to two data license agreements, effective as amended on September 28, 1998.[1]

---

[1]   The agreements, as well as the addendum described in Paragraph 37 below, were initially executed by Bloomberg L.P. and subsequently assigned to BFLP.

25.     Pursuant to a Bloomberg Per Security Data License Agreement (the "Per Security License"), Bloomberg granted UBS a nonexclusive, nontransferable license to use certain financial market data on a request-by-request basis within UBS, in return for which UBS agreed to pay Bloomberg according to a per-request Pricing Schedule annexed to the agreement and subject to amendment from time to time.[2]

26.     Pursuant to a Bloomberg (Bulk Data) Data License Agreement (the "Bulk Data License"), Bloomberg granted UBS a nonexclusive, nontransferable license to use, within UBS, certain financial market data to be delivered by Bloomberg on a periodic basis, in return for which UBS agreed to pay Bloomberg a monthly recurring charge set forth in a Schedule of Services annexed to the agreement and subject to amendment from time to time.[3]

27.     The Per Security License and the Bulk Data License (together the "Global Agreements") both contain an identical Section 4, entitled "Restrictions on Use," which sets forth a number of expressly enumerated restrictions on the manner in which UBS is permitted to use the data licensed from Bloomberg under the Global Agreements.

28.     *First*, the Global Agreements both expressly forbid UBS from causing the licensed data to be "distributed, published, copied, broadcasted, reproduced, ported or otherwise routed to any third party in any way not authorized" in the agreements.  The agreements further bar UBS from using the licensed data in such a way that the licensed data, when so used, becomes a "source of or substitute for the Data" otherwise available from Bloomberg.  These provisions protect Bloomberg's core business from the serious harm that would ensue from the unauthorized use and dissemination of its highly valuable proprietary data.

---

[2]  A copy of the Per Security License is annexed hereto as Exhibit 1.
[3]  A copy of the Bulk Data License is annexed hereto as Exhibit 2.

29.     *Second*, the Global Agreements both expressly forbid UBS from using the licensed data—or the results of calculations performed using the licensed data (which the Agreements call "Resultant Data)—"in any manner that could compete with the business of Licensor or Licensor's affiliates."

30.     *Third*, the Global Agreements expressly "do not include the right to store all or any part of the Data in databases for access by any third party or to distribute any database services containing all or part of such data," except that UBS "may, *for its internal use only*, store the Data for the duration of the Term of [each] Agreement."  (Emphasis added.)

31.     In Section 6 of the Global Agreements, Bloomberg and UBS further expressly agree that "the dissemination or distribution by [UBS] of information identical or similar to the Data and from which dissemination or distribution [UBS] derives or may derive commercial revenue shall be deemed a breach of the terms of paragraphs 4(a) through 4(f) hereof and shall give rise to an immediate right of [Bloomberg] to terminate this Agreement or any portion of the Services provided hereunder."

32.     Section 6 of the Global Agreements also provides that "[i]n the event of a breach or threatened breach of any of the provisions of this Agreement by [UBS] . . . [Bloomberg] shall be entitled to injunctive relief to enforce the provisions hereof . . . .  In the event Licensor prevails in any such action, [Bloomberg] shall be entitled to recover from [UBS] all reasonable costs, expenses and attorneys' fees incurred in connection therewith."

33.     Pursuant to Section 15, the Global Agreements are governed by the laws of the State of New York "without giving effect to the conflicts-of-law provisions thereof," and the parties expressly "consent to the jurisdiction of the courts of the State of New York with respect

to any legal proceedings that may result from a dispute as to the interpretation or breach of any of the terms and conditions" of the Agreements.

34.     Together, the terms of the Global Agreements—including specifically the terms cited herein—preclude a licensee of Bloomberg's proprietary data from passing that data to third parties in any manner that would allow third parties to obtain the benefit of Bloomberg's proprietary data without obtaining—and paying for—a license from Bloomberg.

**The 2005 Second Addendum**

35.     In 2004, UBS approached Bloomberg with questions regarding the type of Bloomberg data available to UBS under the Global Agreements.  One of UBS's concerns related to a risk and portfolio management system, then known as Credit Delta, which used Bloomberg data obtained by UBS under the Global Agreements.

36.     The parties negotiated an addendum to the Global Agreements that both expanded the types of financial instruments and data fields available to UBS under those Agreements and provided UBS with a limited right to use a specified subset of UBS's licensed Bloomberg data within certain UBS software products that were made available to third party clients of UBS.

37.     The negotiations resulted in the execution, on January 24, 2005, of the "Second Addendum to Bloomberg Per Security Data License Agreement and Bloomberg (Bulk Data) Data License Agreement Between Bloomberg L.P. and UBS AG" (the "2005 Addendum").[4]

38.     As relevant here, Section 8 of the 2005 Addendum altered the Services set forth in the Global Agreements by permitting UBS to use specific data fields "*within* certain [UBS]-developed applications."  (Emphasis added.)  Exhibit C of the 2005 Addendum identified the data fields that could be displayed for specific asset classes.  For fixed-income securities, these

---

[4]  A copy of the 2005 Addendum is attached hereto as Exhibit 3.

fields were generally limited to reference data that categorized securities (for example by industry or sector) and provided key economic information relating to the security, such as the coupon or maturity date of a bond.

39.     The same section of the 2005 Addendum expressly provided, however, that UBS "may not use or disseminate such Data in any way which could, as determined in [Bloomberg's] sole good faith discretion, either (i) cause the information so used or distributed to be used as a source of or a substitute for the Data otherwise required to be supplied by [Bloomberg] or available from [Bloomberg] or (ii) compete with the business of [Bloomberg] or [Bloomberg's] affiliates." Thus, the 2005 Addendum made clear that the "source or substitute" prohibition remained in place, as did the prohibition against using Bloomberg's own data to compete with Bloomberg's business. In return for this limited additional right of usage, UBS agreed to pay Bloomberg an annual fee of $300,000.

**Bloomberg Discovers UBS's Misuse of Bloomberg Data**

40.     In April 2017, StatPro, a provider of cloud-based portfolio management and analytics services, announced that it had agreed to acquire from UBS the intellectual property of a UBS-developed portfolio analysis and risk management system then known as "UBS Delta." According to a press release issued by StatPro, and according to representations subsequently made by UBS to Bloomberg, the transaction was scheduled to occur over a period of three to five years "as StatPro incorporates UBS Delta's functionality into its flagship product, *StatPro Revolution.*"[5]

---

[5]  *StatPro to Acquire UBS Delta*, STATPRO (Apr. 7, 2017), http://www.statpro.com/news/statpro-to-acquire-ubs-delta-2/.

41.     The announced acquisition of the UBS Delta system by StatPro raised two concerns at Bloomberg.  *First*, at the time of the transaction, approximately ten of UBS's Bloomberg Terminal subscription accounts were being used by UBS personnel in connection with UBS Delta.  If those personnel were to become employees of StatPro as part of its acquisition of UBS Delta, their continued use of the UBS-licensed Bloomberg Terminals would violate the terms of the applicable Terminal Agreements.

42.     *Second*, to the extent UBS was using licensed Bloomberg data "within" UBS Delta as contemplated in the 2005 Addendum, the acquisition of UBS Delta by StatPro would result in a third party (StatPro) gaining access to proprietary Bloomberg data without a license, in violation of the terms of the Global Agreements and the 2005 Addendum.

43.     Bloomberg therefore contacted UBS in an attempt to determine the implication of the UBS/StatPro transaction with respect to certain Bloomberg Terminal agreements and the Global Agreements.

44.     In June 2017, Vinesh Hirani, then UBS's Deputy Global Head of Market Data Services, confirmed on a telephone call with Bloomberg personnel that the Bloomberg Terminal accounts that had previously been used at UBS in connection with UBS Delta were still being used by the same individuals, but that those individuals had ceased to be employees of UBS and had instead become employees of StatPro.

45.     In August 2017, Bloomberg sent UBS a questionnaire seeking specific information regarding, among other things, the use of proprietary Bloomberg data in connection with UBS Delta.

46.     The questionnaire asked whether "any other Bloomberg services (e.g. Bloomberg Data License accounts)" were being used in connection with UBS Delta; whether "any

Bloomberg data [was] being re-distributed / communicated to clients"; and whether "all clients" of UBS Delta were Bloomberg subscribers.

47.     UBS returned the questionnaire in September 2017.

48.     In response to the question whether UBS Delta was using Bloomberg Data License or other Bloomberg services, UBS answered in the affirmative, asserting that "UBS has an agreement allowing UBS Delta *access* to certain Bulk Fixed Income Extended data to support the UBS Delta service," citing the 2005 Addendum.  (Emphasis added.)

49.     In response to the question whether any Bloomberg data was being redistributed or communicated to clients, UBS stated that the Bloomberg Terminal accounts used in connection with UBS Delta were "NOT being used to redistribute data," though UBS conceded that the Bloomberg Terminals were in fact used to redistribute data through "[o]ccasional indirect communication" or "a one off chart to illustrate a point."  UBS also asserted that "UBS have an agreement in place allowing for certain Bulk Fixed Income Extended data to be *used in support* of the UBS Delta service."  (Emphasis added.)

50.     In response to the question whether all clients of UBS Delta were Bloomberg subscribers, UBS responded: "We don't know."

51.     Bloomberg continued to seek additional information from UBS regarding both the use of the UBS-licensed Bloomberg Terminal accounts by StatPro employees and the use of Bloomberg proprietary data in—and distribution of proprietary Bloomberg data through—UBS Delta.

52.     On January 12, 2018, a Bloomberg employee sent UBS's Vinesh Hirani and Clinton Mosely, the Chief Operating Officer of Foreign Exchange, Rates, and Credit Distribution, an e-mail asking:

> What do the client outputs from UBS Delta look like (is it just a set
> of risk numbers viewable on the screen or are the clients
> additionally able to access / download Bloomberg datasets
> associated with these calculations or with the securities within their
> portfolio)?

53.     UBS responded on January 16, 2018 that UBS Delta did in fact allow clients to

access and download proprietary Bloomberg data, writing:

> Clients are able to extract their portfolio information on the screen,
> via pdf or excel (csv or xml).  They cannot download the datasets
> associated with the calculations per se (i.e. the inputs), but, can
> obviously see the blended data as it relates to their portfolios
> (including *reference data* & UBS calculations) and therefore will
> see the end result which is a blend of data from various Market
> data suppliers and UBS data sets (including Bloomberg – for
> example pricing data for a bond comes from Reuters and reference
> data such as the Coupon comes from Bloomberg). (Emphasis
> added.)

54.     Since the vast majority of the data subject to the expanded license in Section 8 of

the 2005 Addendum is *reference data*, the import of Hirani's email was clear: UBS Delta

facilitated the redistribution of Bloomberg data directly to unlicensed third parties, in violation of

the Global Agreements and the 2005 Addendum.

### Bloomberg Terminates The Terminals Used by StatPro and the UBS Delta Data License

55.     In light of UBS's concessions set forth above, Bloomberg determined that the use

of UBS-licensed Bloomberg Terminals by StatPro employees constituted a breach of UBS's

Bloomberg Terminal subscriptions, and that the ability of UBS clients to access and download

proprietary Bloomberg data through UBS Delta constituted a breach of the Global Agreements

as amended by the 2005 Addendum.

56.     Bloomberg therefore sent UBS a letter on February 14, 2018, giving notice that

Bloomberg was terminating the Bloomberg Terminal subscriptions at issue and demanding that

UBS "cease and desist sharing, making available, and/or allowing access to current and historical Bloomberg data by any third party . . . ."

57.     Bloomberg also gave notice that, pursuant to Section 6 of the Global Agreements, which allowed Bloomberg to terminate "any portion of the Services provided hereunder" in the event of a breach, Bloomberg was terminating the license created under Section 8 of the 2005 Addendum that permitted the use of Bloomberg data "within certain [UBS]-developed applications." Bloomberg demanded that "no later than May 15, 2018 [UBS] cease and desist using Bloomberg data within UBS Delta or any other application made available to UBS customers or other third parties"; that UBS "cease and desist sharing, making available, and/or allowing access to current and historical data by any third party"; and that UBS "ensure that all such parties delete and purge any such Bloomberg data."

58.     In response to subsequent requests from UBS, Bloomberg agreed to delay the termination of the Bloomberg Terminal subscriptions; the subscriptions were ultimately terminated on or around April 13, 2018.

**Bloomberg Attempts to Exercise Its Contractual Audit Rights**

59.     In response to a request from UBS, Bloomberg also agreed to extend the deadline for UBS to desist from using Bloomberg data within UBS Delta to June 15, 2018.

60.     In the intervening period between February 14, 2018 and June 15, 2018, Bloomberg attempted to obtain more information about UBS's use of Bloomberg data in UBS Delta in order to test UBS's claims that its use had been consistent with its contractual duties.

61.     Section 8 of the Global Agreements, entitled "Access and Audit," permits Bloomberg "at any time to monitor, either physically or electronically, [UBS's] use of the [licensed] data."

62.     In the February 14, 2018 letter, Bloomberg informed UBS that it intended to "exercise its audit and information rights under the [Global] Agreements, including without limitation, for the purpose of confirming all use of Bloomberg data and services in connection with" UBS Delta "and to ensure your compliance with our demands as set forth herein."

63.     On February 28, 2018, Bloomberg sent UBS an "Audit Process" document defining the scope of the inquiry Bloomberg intended to perform regarding UBS's "use of Bloomberg Services under contracts between Bloomberg and UBS AG and/or its affiliates . . . ."

64.     The Audit Process document identified, as one of its "primary" focuses, "all use of Bloomberg data under Section 8 of that certain Second Addendum to the Data License Agreement," in order to confirm whether UBS "has ceased sharing, making available and/or allowing access to current or historical Bloomberg data by any third party . . . ," and whether UBS "has ceased using Bloomberg data within (a) all instances of UBS Delta made available to third parties (i.e., instances other than for internal use by UBS) and (b) any other application made available to third parties."

65.     During a subsequent telephone call on March 9, 2018, UBS again admitted that UBS Delta redistributed proprietary Bloomberg data, although the participating UBS personnel wrongly asserted that the redistribution was permitted under the 2005 Addendum.

66.     On March 21, 2018, three Bloomberg personnel attended (in person or by teleconference) a demonstration of UBS Delta performed by UBS and StatPro employees at UBS's offices in London.

67.     The demonstration confirmed the admission made by Vinesh Hirani on January 16, 2018—namely, that the UBS Delta service did in fact allow UBS clients to access and export

proprietary Bloomberg data, regardless of whether the UBS client itself had a Bloomberg data license covering the data in question.

68.     These demonstrations also confirmed that UBS Delta clients could access and download Bloomberg reference data associated not just with those users' actual portfolio holdings, but with the *entire universe* of Bloomberg reference data made available to UBS under Section 8 of the 2005 Addendum.  In other words, using a UBS Delta account, UBS customers could access and download the entire data set that Bloomberg had allowed UBS to use only "within" UBS Delta.

69.     On May 3, 2018, UBS confirmed this in writing, stating that "UBS Delta clients can see more [Bloomberg proprietary data] than [just the data associated with] their active holdings, and can search, for example, via a specific ISIN for any bond they do not necessarily have, as we showed in the [March 21] demo."

70.     Following the March 21 demonstration, Bloomberg attempted to obtain more information regarding UBS Delta, including the precise technical architecture by which propriety Bloomberg data was transferred from Bloomberg's servers through UBS's internal systems to UBS Delta.

71.     Bloomberg also sought to better understand who the UBS Delta clients were in order to determine whether they were also Bloomberg customers and, if so, whether they had data licenses covering the Bloomberg data that UBS had allowed them to access and export through UBS Delta.

72.     Despite repeated requests, UBS has steadfastly refused to identify the UBS Delta clients, providing only "the overall number of clients and users and the overall number of securities per asset class across those clients."

73.     Nor has UBS provided any meaningful additional information regarding the technical architecture by which proprietary Bloomberg data is transferred from Bloomberg's distribution servers through UBS's internal systems to UBS Delta—including whether, contrary to Section 4 of the Global Agreements, UBS has "store[d] all or any part of the Data in databases for access by any third party."

74.     Instead, on July 2, 2018, UBS Group Chief Financial Officer Kirt Gardner informed Bloomberg that UBS intended to replace Bloomberg as a source of market data for UBS Delta by August 2018.

75.     Bloomberg does not contest UBS's right to replace Bloomberg as a source of market data for UBS Delta.  In light of Bloomberg's February 14, 2018 termination of the data license created by Section 8 of the 2005 Addendum, UBS is required to desist from using Bloomberg data in all instances of UBS Delta made available to third parties.

76.     However, the process of transitioning a data-intensive application like UBS Delta from one data provider to another necessarily creates an inherent risk of unauthorized disclosure or use of proprietary data for the benefit of the new data provider.

77.     For example, running UBS Delta processes using data from a source other than Bloomberg is likely to generate different values, in at least some instances, than those that would be generated using Bloomberg data.  Given that UBS Delta is a customer-facing application, and that customers will therefore notice any changes in calculated values associated with a switch from Bloomberg to an alternate data provider, UBS has a strong incentive to "validate" its replacement data by comparing the values generated using Bloomberg data with the values generated using the alternate data and identifying any differences.

78. Additionally, given the high quality of Bloomberg's data, and because UBS Delta customers have, to date, received and observed values calculated using Bloomberg data, UBS has a strong incentive to address any such differences by altering the replacement data set so that it generates the same calculated values as those that are generated by the use of Bloomberg's data.

79. Any such attempt by UBS or its new data provider(s) to validate the new values by comparing them to values generated using Bloomberg data, and to correct any variances, would result in the validation, alteration—and improvement—of a competing data vendor's products and services to the detriment of Bloomberg, in further breach of the Global Agreements.

80. Moreover, UBS is likely to seek an alternative data source or sources that provide data at least as extensive in coverage as the data licensed under the Global Agreements. Yet the continued use by UBS or disclosure to Bloomberg's competitors of generalized or aggregated information about Bloomberg's data—including information regarding the scope of Bloomberg's data coverage—constitutes another contractual breach that would result in the erosion of the competitive advantage Bloomberg has acquired through great expenditure of time and resources.

81. Any transition of UBS Delta from Bloomberg data to a new source of market data must therefore be properly and carefully managed to safeguard Bloomberg's proprietary interests in its data. UBS's stated intent to complete the transition by August 2018 strongly suggests that work on the transition has already begun and is ongoing.

82. Despite repeated requests by Bloomberg, UBS has refused to confirm that it will comply with Bloomberg's February 14, 2018 demand to delete and purge all Bloomberg data from customer-facing instances of UBS Delta. UBS has also refused to confirm that it will

ensure (as demanded in the February 14, 2018 letter) that all unauthorized third-party recipients of redistributed Bloomberg data likewise delete and purge all such data.

83.     UBS's refusal to confirm the deletion and purging of Bloomberg data from customer-facing instances of UBS Delta and from UBS Delta customers themselves raises a reasonable concern that UBS has not taken, and will not take, adequate steps to halt and prevent the unauthorized redistribution of Bloomberg data.

## FIRST CAUSE OF ACTION

### (Breach of Contract)
### (Unauthorized Redistribution of Bloomberg Data to UBS Delta Clients)

84.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

85.     Plaintiff and UBS are parties to the Global Agreements and the 2005 Addendum.

86.     Section 4 of the Global Agreements expressly forbids UBS from using the data licensed thereunder in such a way that it becomes a "source of or substitute for" data otherwise available from Bloomberg.

87.     Section 4 of the Global Agreements expressly forbids UBS from storing all or any part of the data licensed from Bloomberg in databases for access by any third party, and from distributing any database services containing all or part of the licensed data, except that UBS "may, *for its internal use only*, store the Data for the duration of the Term of [each] Agreement."

88.     Section 6 of the Global Agreements provides that "the dissemination or distribution by [UBS] of information identical or similar to the Data and from which dissemination or distribution [UBS] derives or may derive commercial revenue shall be deemed a breach" of the Agreements.

89.     Section 8 of the 2005 Addendum to the Global Agreements permits UBS to use certain data licensed thereunder "within certain [UBS]-developed applications," but expressly forbids UBS from "us[ing] or disseminat[ing] such Data in any way which could, as determined in [Bloomberg's] sole good faith discretion, . . . (i) cause the information so used or distributed to be used as a source of or a substitute for the Data otherwise . . . available from [Bloomberg]."

90.     By allowing UBS Delta clients to access and export proprietary Bloomberg data on demand, UBS has caused the information available through UBS Delta to be used as a source of or a substitute for Bloomberg's proprietary data in violation of the Global Agreements as amended by the 2005 Addendum.

91.     By allowing UBS Delta clients to access and export proprietary Bloomberg data on demand and without regard to the existence or scope of any Bloomberg license held by the client, UBS has disseminated or distributed information identical or similar to the data licensed under the Global Agreements, from which dissemination or distribution UBS derives commercial revenue, in violation of the Global Agreements as amended by the 2005 Addendum.

92.     By allowing UBS Delta clients to access and export proprietary Bloomberg data—including as part of "a blend of data from various Market data suppliers"—UBS has stored all or any part of the data licensed from Bloomberg in databases for access by any third party and has distributed a database service containing all or part of the licensed data other than for internal use in violation of Section 4 of the Global Agreements.

93.     UBS's breach of the Global Agreements and the 2005 Addendum in this manner has directly and proximately damaged Plaintiff in an amount greater than $75,000 to be determined at trial, but not less than the amount of the Bloomberg data license fees that UBS

Delta customers were able to avoid by accessing and exporting proprietary Bloomberg data through UBS Delta rather than pursuant to a Bloomberg data license.

### SECOND CAUSE OF ACTION

#### (Breach of Contract)
#### (Unauthorized Use of Licensed Data to Compete With Bloomberg)

94.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

95.     Section 4(b) of the Global Agreements prohibits the use of Bloomberg's data or any data that is derived from Bloomberg's data "in any manner that could compete with the business of Licensor or Licensor's affiliates."

96.     Section 8 of the 2005 Addendum to the Global Agreements permits UBS to use certain data licensed thereunder "within certain [UBS]-developed applications," but expressly forbids UBS from "us[ing] or disseminat[ing] such Data in any way which could, as determined in [Bloomberg's] sole good faith discretion, . . . (ii) compete with the business of [Bloomberg] or [Bloomberg's] affiliates."

97.     By charging UBS customers to access a system that allows the downloading of proprietary Bloomberg data, UBS has effectively competed with Bloomberg's data licensing business in violation of the Global Agreements as amended by the Second Addendum.

98.     Additionally, UBS Delta competes with Bloomberg's PORT+ product. PORT+ is a portfolio and risk analytics tool that allows users to analyze various risk metrics and generate various reports at an organizational level. Bloomberg has invested substantial resources to build and develop the PORT+ program, which it offers to Bloomberg Terminal users for an additional fee.

99.     UBS Delta also includes a reporting function that allows users to analyze various risk metrics and generate organizational-level reports, and thereby competes directly with Bloomberg's PORT+ program.

100.     By using the data licensed under the Global Agreements in UBS Delta, UBS has therefore used that data in a manner that competes with the business of Plaintiff and its affiliates, in violation of the Global Agreements as amended by the 2005 Addendum.

101.     UBS's breach of the Global Agreements and the 2005 Addendum in this manner has directly and proximately damaged Plaintiff in an amount greater than $75,000 to be specifically determined at trial, but not less than the amount of the Bloomberg data license fees that UBS Delta customers were able to avoid by accessing and exporting proprietary Bloomberg data through UBS Delta rather than pursuant to a Bloomberg data license, as well as the Bloomberg PORT+ license fees that Plaintiff would have received but for UBS's unauthorized competitive use of the licensed.

### THIRD CAUSE OF ACTION

#### (Breach of Contract)
#### (Unauthorized Redistribution of Bloomberg Data to StatPro Group Plc)

102.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

103.     Section 4 of the Global Agreements expressly forbids UBS from causing the licensed data to be "distributed, published, copied, broadcasted, reproduced, ported or otherwise routed to any third party in any way not authorized" in the agreement.

104.     On February 14, 2018, Bloomberg demanded that UBS cease and desist sharing, making available, and/or allowing access to current and historical Bloomberg data by StatPro, and that UBS ensure that StatPro delete and purge any such Bloomberg data.

105.    UBS has refused to confirm that it has complied with these demands.

106.    In light of its conceded violations of the Terminal Agreements and the Global Agreements, UBS's refusal to confirm compliance with Bloomberg's demands set forth above raises the reasonable inference that UBS:  (i) has not ceased and desisted from making Bloomberg data available to StatPro, and has continued to allow StatPro to have access to Bloomberg data, (ii) has not ensured that StatPro has deleted and purged any such Bloomberg data in its possession, and (iii) has not implemented any steps to safeguard against the disclosure of Bloomberg's data to StatPro.

107.    By allowing StatPro and employees of StatPro, to access and export proprietary Bloomberg data in connection with StatPro's acquisition of UBS Delta, UBS has allowed the licensed data to be distributed to a third party without authorization in violation of the Global Agreements.

108.    The disclosure of Bloomberg's proprietary data to StatPro, a competitor to Bloomberg in the market for portfolio management software, allows StatPro to leverage Bloomberg's curated proprietary data set to improve its own products, thereby unfairly reducing Bloomberg's competitive advantage.

109.    UBS's breach of the Global Agreements and the 2005 Addendum through the unauthorized disclosure of proprietary data to StatPro, a competitor in the market for portfolio management software, has caused Plaintiff irreparable and ongoing harm, including through the irreversible improvement of the products and/or services of a competitor to Bloomberg.

110.    Plaintiff's remedy at law for such impermissible disclosures of proprietary data to StatPro would be inadequate to compensate it for the harm that will have been done.  The use of Bloomberg's data and information about Bloomberg's data to improve competing products and

services cannot be undone, and the resulting loss of competitive advantage and goodwill to Plaintiff will therefore continue indefinitely.

111.    In addition to monetary damages, Plaintiff therefore seeks both preliminary and permanent injunctive relief to protect its data and sensitive business information from being disclosed to StatPro, and to protect its legitimate business interests and goodwill.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)
### (Unauthorized Redistribution of Bloomberg Data to Competing Data Vendors)

112.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

113.    Section 4 of the Global Agreements expressly forbids UBS from causing the licensed data to be "distributed, published, copied, broadcasted, reproduced, ported or otherwise routed to any third party in any way not authorized" in the agreement.

114.    On February 14, 2018, Bloomberg demanded that UBS cease and desist sharing, making available, and/or allowing access to current and historical Bloomberg data by any third party, and that UBS ensure that all such third parties delete and purge any such Bloomberg data.

115.    To date, UBS has refused to confirm that it has complied with these demands.

116.    On July 2, 2018, UBS represented to Bloomberg that it intends to replace Bloomberg as a supplier of market data to UBS Delta by August 2018, which strongly suggests that UBS will imminently begin work on migrating UBS Delta to a different data provider.

117.    In light of its conceded violations of the Terminal Agreements and the Global Agreements, UBS's refusal to confirm compliance with Bloomberg's demands set forth above raises the reasonable inference that UBS: (i) has not ceased and desisted from making Bloomberg data available to third parties, and has continued to allow third parties to have access

to Bloomberg data, (ii) has not ensured that third parties have deleted and purged any such Bloomberg data in their possession, and (iii) has not implemented any steps to safeguard against the disclosure of Bloomberg's data to one or more competitors to Bloomberg in connection with its data migration.

118.    Without appropriate safeguards, there is an inherent risk and considerable likelihood that Bloomberg's proprietary data—including both data values and information regarding the scope and organization of the data—may be disclosed or disseminated to one or more competing market data providers during the process of migrating UBS Delta from Bloomberg to an alternate source of market data.

119.    By allowing competing data providers to have access to proprietary Bloomberg data in connection with the replacement of Bloomberg data with data from competing providers as a source of data for UBS Delta, UBS would allow the licensed data to be distributed to one or more third parties without authorization in violation of the Global Agreements.

120.    In light of UBS's past misuse of Bloomberg data, and in light of UBS's refusal to identify the steps it plans to take (if any) to safeguard Bloomberg's data during the replacement process, Bloomberg has a reasonable fear of imminent harm through improper disclosure of its proprietary data to competitors.

121.    UBS's breach of the Global Agreements and the 2005 Addendum through the imminently threatened disclosure of proprietary data to competing market data providers threatens to cause Plaintiff irreparable and ongoing harm, including through the irreversible improvement of the products and/or services of one or more of Bloomberg's competitors.

122.    Plaintiff's remedy at law for such impermissible disclosures of proprietary data to competitors would be inadequate to compensate it for the harm that will have been done.  The

use of Bloomberg's data and information about Bloomberg's data to improve competing products and services cannot be undone, and the resulting loss of competitive advantage and goodwill to Plaintiff will therefore continue indefinitely.

123.    In addition to monetary damages, Plaintiff therefore seeks both preliminary and permanent injunctive relief to protect its data and sensitive business information from being disclosed to competitors, and to protect its legitimate business interests and goodwill.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

a. An award of damages against Defendant, in an amount to be proven at trial, but including, at a minimum, the price of licensing the Bloomberg data to all of UBS Delta's customers and to all other unauthorized third party recipients of such data for the period of Defendant's impermissible use, including pre- and post-judgment interest on all such damages;

b. The issuances of a preliminary injunction and a final, permanent injunction that:

    i.   directs UBS to delete and purge Bloomberg data from all customer-facing instances of UBS Delta;

    ii.  directs UBS to use its best efforts to cause UBS Delta customers to delete and purge all Bloomberg data acquired via UBS Delta;

    iii. directs UBS to use its best efforts to cause StatPro Group Plc to delete and purge all Bloomberg data acquired in connection with UBS Delta;

    iv.  directs UBS to use its best efforts to cause any other unauthorized third party recipient of Bloomberg data acquired via or in connection with UBS Delta to delete and purge all such data;

    v.   enjoins UBS from directly or indirectly disclosing Bloomberg data, Resultant Data (as defined in the Global Agreements), or information about such Bloomberg data or Resultant Data to any person or company in connection with the replacement of Bloomberg data as a source of data for UBS Delta;

    vi.  requires UBS to identify the process(es) they will use to replace Bloomberg as a source of data for UBS Delta with data from any other source(s), including the steps UBS will take to avoid the disclosure of Bloomberg data or information about such data to any other such source(s); and

    vii.  requires UBS to allow Bloomberg or a designated third party to exercise its rights under the Global Agreements to monitor the use of licensed data in UBS's migration of the UBS Delta platform to a new source of market data;

  c.  An award for reasonable attorneys' fees and costs of the suit incurred herein; and

  d.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues properly triable thereby.


DATED:   New York, New York
          July 12, 2018

                             QUINN EMANUEL URQUHART &
                             SULLIVAN, LLP

By: _____
               Andrew J. Rossman (AR0596)
               David Mader (DM4217)
               Sophia Qasir (SQ3758)

             51 Madison Avenue, 22nd Floor
             New York, New York 10010-1601
             (212) 849-7000
             andrewrossman@quinnemanuel.com
             davidmader@quinnemanuel.com
             sophiaqasir@quinnemanuel.com

             *Attorneys for Plaintiff Bloomberg Finance L.P.*