UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12/19/2018
```

-------------------------------------------------------------X
BLOOMBERG FINANCE L.P.,                  :
                                         :
                         Plaintiff,      :
                                         :          18-CV-6334 (VEC)
            -against-                    :
                                         :          OPINION AND ORDER
UBS AG,                                  :
                                         :
                         Defendant.      :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiff Bloomberg Finance L.P. brought this action to recover damages for, and to obtain injunctive relief to prevent, the alleged unauthorized use and dissemination of its proprietary financial data by Defendant UBS AG in violation of various written agreements between the parties. *See* Dkt. 1 (Compl.) ¶ 1. Defendant UBS has moved (1) to dismiss this action on grounds of *forum non conveniens*, *see* Dkt. 18, and (2) in the alternative, to dismiss Bloomberg's first, second, and fourth causes of action under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), *see* Dkt. 21. UBS's motions are DENIED.

## BACKGROUND[1]

Plaintiff Bloomberg Finance L.P. ("Bloomberg") is a Delaware limited partnership with its principal place of business in New York City. Dkt. 1 (Compl.) ¶ 12. Bloomberg uses proprietary methods and processes to aggregate, organize, and curate market and reference data for over fifty million financial instruments across a range of asset classes. *Id*. ¶¶ 17-18. Defendant UBS AG ("UBS") is a Swiss joint-stock company with its principal place of business

---

[1]      The Court draws the following factual background from the Complaint and accepts Bloomberg's allegations as true. *See, e.g.*, *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

in Switzerland.  *Id.* ¶ 13. UBS operates a federally regulated Federal Branch in New York City.
*Id.*

Bloomberg offers its data via "Bloomberg Terminal" subscriptions to individual
consumers and via data licenses that allow institutional consumers to access and use the data
within the institution's own internal applications and systems.  Dkt. 1 (Compl.) ¶ 3.  In 1998,
Bloomberg and UBS entered into two such data-license agreements, one permitting UBS to use
Bloomberg's market data on a fee-per-request basis and the other permitting UBS to download
entire Bloomberg data sets in exchange for a monthly recurring fee.  *Id.* ¶¶ 5, 19-22, 24-27; *see
also id.* ex. 1 (Per-Security License), ex. 2 (Bulk-Data License).  Because the text of the two
agreements is identical in every way relevant to resolving UBS's motions to dismiss, this opinion
refers to them collectively as the "Global Agreements" and cites to them collectively.  Each
Agreement contains identical restrictions on UBS's use of the licensed data, including a
prohibition on redistribution of that data to third parties.  *See id.* ex. 1 (Per-Security License)
§§ 4, 6, ex. 2 (Bulk-Data License) §§ 4, 6.  The Agreements also contain provisions specifying
that the Agreements were "made and entered into in the State of New York"; that they shall be
governed by "the laws of the State of New York without giving effect to the conflicts-of-law
provisions thereof"; and that the parties "consent to the jurisdiction of the courts of the State of
New York with respect to any legal proceedings that may result from a dispute as to the
interpretation or breach of any of the [Agreements'] terms and conditions . . . ."  *Id.* ex. 1 § 15,
ex. 2 § 15.

In 2005, in an agreement referred to as the "2005 Addendum," the parties amended the
1998 Global Agreements to grant UBS limited use of a specified subset of the licensed data
"within" certain applications that UBS had developed that would be made available to third-

party UBS clients—most relevant here, a risk and portfolio-management system called "UBS Delta." Dkt. 1 (Compl.) ¶¶ 35-37; *id.* ex. 3 (2005 Addendum).  In exchange for this additional usage right, UBS agreed to pay Bloomberg an annual fee of $300,000.  *Id.* ¶ 39.  The provisions of this Addendum are recited in more detail below.

In April 2017, StatPro, an English company that provides cloud-based portfolio-management and analytics services, announced that UBS had agreed to sell its UBS Delta application to StatPro.  Dkt. 1 (Compl.) ¶ 40.  According to a StatPro press release and representations by UBS to Bloomberg, the transaction was scheduled to occur over a period of three to five years.  *Id.*

Concerned (1) that as part of the sale transaction, UBS Delta personnel with UBS-purchased Bloomberg Terminal subscriptions would become employees of StatPro in violation of the Terminal subscription agreements, and (2) that because of StatPro's acquisition of UBS Delta, StatPro—a competitor of Bloomberg—would get access to proprietary data Bloomberg had provided to UBS solely for use within UBS Delta, Bloomberg contacted UBS to determine the deal's implications for Bloomberg's data.  Dkt. 1 (Compl.) ¶ 41-43.  Over the next several months, UBS confirmed, as relevant here, (1) that former UBS Delta employees who had become StatPro employees because of the acquisition were still using Bloomberg Terminal accounts licensed by UBS, *id.* ¶ 44; (2) that although UBS Delta clients "cannot download the datasets associated with the [risk] calculations per se (i.e., the inputs)," UBS Delta enabled them "to extract their portfolio information on the screen, via pdf or excel" and to "see . . . the end result which is a blend of data from various Market data suppliers and UBS data sets (including Bloomberg—for example pricing data for a bond comes from Reuters and reference data such as the Coupon comes from Bloomberg)," *id.* ¶ 52-53 (emphasis omitted).

In February 2018, Bloomberg notified UBS that Bloomberg was terminating the ten Bloomberg Terminal subscriptions UBS had obtained for its former UBS Delta employees.  Dkt. 1 (Compl.) ¶ 56.  Bloomberg also demanded that UBS "cease and desist using Bloomberg data within UBS Delta or any other application made available to UBS customers or other third parties"; "cease and desist sharing, making available, and/or allowing access to current and historical data by any third party"; and "ensure that all such parties delete and purge any such Bloomberg data."  *Id.* ¶ 57.

Between February and June 2018, Bloomberg exercised its right under the Global Agreements to audit UBS's use of its data.  Dkt. 1 (Compl.) ¶¶ 60-73; *see also id.* ex. 1 § 8, ex. 2 § 8.  In March 2018, Bloomberg's auditors attended a demonstration of UBS Delta performed by UBS and StatPro at UBS's offices in London.  *Id.* ¶ 66.  This demonstration confirmed that UBS Delta allowed UBS clients to access and download the entire universe of proprietary Bloomberg data made available to UBS under the 2005 Addendum, regardless of whether those clients had Bloomberg data licenses that covered the data.  *Id.* ¶¶ 67–68.  UBS confirmed this state of affairs in writing in May 2018.  *Id.* ¶ 69.

In July 2018, UBS notified Bloomberg that it was replacing Bloomberg as a source of data for UBS Delta and expected that the transition to a new data provider would be completed by August 2018.  Dkt. 1 (Compl.) ¶¶ 10, 74.  According to its complaint, Bloomberg does not contest UBS's right to replace Bloomberg as a source of market data for UBS Delta but contends that without appropriate safeguards, the process of migrating the application from Bloomberg to another data provider poses a substantial risk of exposing Bloomberg's data to a competitor who may, in turn, use that data to "validate" or otherwise improve its own data.  *Id.* ¶¶ 75-81.  Despite Bloomberg's requests, UBS has refused to confirm that it will "delete and purge all Bloomberg

data from customer-facing instances of UBS Delta" and ensure that unauthorized third-party recipients of redistributed Bloomberg data also delete and purge all such data. *Id.* ¶¶ 82–83.

Bloomberg filed this action on July 12, 2018, asserting four counts of breach of contract and seeking both money damages and injunctive relief to prevent further such damages. *See* Dkt. 1 (Compl.). On August 13, 2018, UBS made two motions to dismiss: one to dismiss the entire case on grounds of *forum non conveniens*; the other to dismiss Counts I, II, and IV of pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). *See* Dkts. 18-22.

## DISCUSSION

### I. UBS's Motion to Dismiss Based on *Forum Non Conveniens*

The Court denies UBS's motion to dismiss this case on grounds of *forum non conveniens*. In exercising its discretion to determine whether UBS's motion ought to be granted, the Court proceeds in three steps. First, the Court must determine the degree of deference owed to Bloomberg's choice of forum. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005). Second, the Court must consider whether UBS's proposed alternative forum— the United Kingdom—is adequate to adjudicate the parties' dispute. *Id.* And third, if the proposed alternative forum is indeed adequate, the Court must "balance[] the private and public interests implicated in the choice of forum." *Id.* The Court addresses each of these steps in turn. In doing so, the Court considers both the pleadings and the parties' affidavits. *See, e.g.*, *Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 218 (S.D.N.Y. 2011).

#### A. The Degree of Deference Owed to Bloomberg's Choice of Forum

Because Bloomberg has its principal place of business in New York City, its choice to file suit in this Court is owed great deference. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65,

71 (2d Cir. 2001) (en banc) (explaining that "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations" but that a plaintiff's choice "is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum" (citation omitted)).

Contrary to UBS's suggestion, there is no reason to believe that Bloomberg's choice of forum is illegitimately "strategic" or "tactical," Dkt. 19 (Mem. in Supp. of Mot. to Dismiss on Grounds of *Forum Non Conveniens*) (hereafter, "FNC Mot.") at 3-5, such that the Court owes it reduced deference, *see Iragorri*, 274 F.3d at 72-73 ("[W]e give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience and the ability of a U.S. resident plaintiff to obtain jurisdiction over the defendant, and diminishing deference . . . to the extent that it was motivated by tactical advantage," "such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States . . . , the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum").  As far as the Court can tell, Bloomberg sued UBS in the Southern District of New York because it is Bloomberg's home district; because UBS is amenable to suit here; and because the suit seeks to vindicate contractual rights entered into in the State of New York and governed by New York law.  *See* Dkt. 1 (Compl.) ¶ 12 (alleging that Bloomberg's principal place of business is in New York City); Dkt. 19 (FNC Mot.) at 2 n.5 (conceding that the relevant agreements are governed by New York law); *see also* Dkt. 1 (Compl.) ex. 1 § 15, ex. 2 § 15 (section of Global Agreements providing that Agreements are "made and entered into in the State of New York and shall be governed by and construed in accordance with the laws of the State of New York").  UBS offers no persuasive reason to believe otherwise.  Contrary to UBS's

argument, the fact that Bloomberg chose its home forum, where *its* employees and documents are located (*see* Dkt. 1 (Compl.) ¶ 12), over a different forum, where *UBS's* employees and documents are located, is not itself evidence of illegitimate forum shopping. *Nat'l Union Fire Ins. Co. of Pittsburgh v. BP AMOCO, P.L.C.*, No. 03-CV-0200, 2003 WL 21180421, at *3 (S.D.N.Y. May 20, 2003) (Lynch, J.) ("[T]he fact that plaintiffs unquestionably chose a time and place of filing that was to their liking and elected to file in the United States rather than to join the litigation in the United Kingdom does not demonstrate any improper motivation."). A contrary holding would practically nullify the principle that "the greatest deference is afforded a plaintiff's choice of its home forum," *Norex*, 416 F.3d at 154, in the broad swath of cases in which the defendant is not headquartered or substantially present in the plaintiff's home forum. The Court refuses to endorse such an approach.

The Court also rejects UBS's argument that the Court owes less deference to Bloomberg's choice of forum because it "has not filed suit in the venue provided in the parties' agreements, which refer to 'the courts of the State of New York,' not this federal court." Dkt. 19 (FNC Mot.) at 3 & nn. 7-8. If anything, the fact that the parties agreed to litigate in *some* court in New York State is further proof that Bloomberg's choice to sue UBS here rather than in the United Kingdom was motivated by convenience rather than illegitimate strategic or tactical considerations. *See Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 58 (S.D.N.Y. 2001) ("Because the parties agreed that New York courts would have jurisdiction of disputes arising from the denial of claims under the Policy, Defendants have no basis for challenging this forum on the basis that it is inconvenient to the parties. Although a permissive forum selection clause is entitled to less weight than a mandatory one, the fact that both parties initially accepted the jurisdiction of the courts of New York must count." (alterations and internal quotation marks

omitted)); *see also Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W.D. Tex.*, 571 U.S. 49, 60 (2013) (noting that 28 U.S.C. § 1404(a)'s inter-district-transfer provision, which was at issue in *Reliance Insurance Co.*, is "merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system"). Whether the parties agreed to sue only in New York *state* court, as UBS argues, could be relevant to whether this Court has jurisdiction over this dispute, but it is also relevant to whether proceeding in this Court (which is across the street from a court in which UBS has unquestionably agreed to litigate) is onerously inconvenient as compared to proceeding in the United Kingdom.

*FindWhere Holdings, Inc. v. Systems Environment Optimization, LLC*, 626 F.3d 752, 754-56 (4th Cir. 2010), which concerned the interpretation of a jurisdiction-stripping forum-selection clause, is therefore inapposite. So is *Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009). *Aguas* clarified that a permissive forum-selection clause in an international dispute does not enjoy a presumption of *M/S Bremen* enforceability, but *Aguas* does *not* hold (or even suggest) that such a clause reduces the deference owed a plaintiff's choice of forum under "the traditional *forum non conveniens* standards articulated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)," and by the Second Circuit in *Iragorri*.[2]

For these reasons, the Court concludes that it owes Bloomberg's choice of forum great deference.

B. The Adequacy of UBS's Proposed Alternative Forum

Bloomberg does not question, *see* Dkt. 32 (Mem. in Opp. to UBS Mots.) at 12 n.9, and the Court sees no reason to doubt, that the United Kingdom is an adequate alternative forum for

---

[2]    The Court notes for the record that UBS does not argue that the parties' forum-selection clause deprives this Court of jurisdiction over this dispute.

this dispute.  The Court must therefore proceed to assess the convenience to the parties of

litigating this case in this Court.  *Iragorri*, 274 F.3d at 73.

C.   The Balance of Private and Public Interests

At this step, the Court "must balance two sets of factors to ascertain whether the case

should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the

defendant."  *Iragorri*, 274 F.3d at 73.  The first set, called the "private interest factors," include,

as relevant here, "the relative ease of access to sources of proof; availability of compulsory

process for attendance of unwilling, and the cost of obtaining attendance of willing,

witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and

inexpensive."  *Id.* at 73-74 (quoting *Gilbert*, 330 U.S. at 508).  In weighing these factors, the

Court must compare "the hardships defendant would suffer through the retention of jurisdiction

and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring

suit in another country."  *Id.* at 74.  The second set, the so-called "public interest" factors,

include "administrative inefficiency in trying a case in a busy court and away from the locus of

the injury; the burden that jury duty may impose on the community if the case is tried in a venue

with no connection to the issues in dispute; for cases that affect many people, the public's

interest in having easy access to the trial court proceedings; a community's interest in having a

local case decided at home; and, in a diversity case, the public interest in having the case decided

in the jurisdiction whose law will govern the case."  *Mayer v. Time, Inc.*, No. 17-CV-5613, 2018

WL 1738322, *3 (S.D.N.Y. Apr. 9, 2018).

UBS has not carried its burden to show that Bloomberg's chosen forum is genuinely

inconvenient or that the United Kingdom is significantly preferable.  UBS's primary argument is

that the "cost of litigation in New York will far exceed that of litigating in London" because

"relevant non-party witnesses reside in the U.K. and elsewhere in Europe and cannot be compelled to attend trial" here.  Dkt. 19 (FNC Mot.) at 6-7.  As the party seeking dismissal "based on the availability of witnesses," however, UBS "must provide the Court with a specific list of probable witnesses who will be inconvenienced by the current forum and a general statement concerning the witnesses' testimony."  *Reliance Ins. Co.*, 155 F. Supp. 2d at 58; *accord Mendes Junior Int'l Co. v. Banco Do Brasil, S.A.*, 15 F. Supp. 2d 332, 339 (S.D.N.Y. 1998).  As to witnesses who, according to UBS, are critical to the case but cannot be compelled to appear for trial, UBS must show that "[g]iven the availability of letters rogatory as a means to obtain deposition testimony from witnesses outside of the forum nation," "live testimony is particularly necessary in this case, and that some witnesses will be unwilling to travel to New York."  *Nat'l Union*, 2003 WL 21180421, at *6.  The evidence UBS offers along those lines— UBS's counsel's declarations that "the day-to-day operations of UBS Delta are supported by approximately 54 individuals who are full-time UBS consultants or contractors"; that "UBS Delta currently has over 100 clients . . . that are predominantly located in the U.K. and Europe"; and that "all of the StatPro employees involved in the transfer of UBS Delta from UBS to StatPro work in London and reside in the U.K., or in Milan, Italy," Dkt. 20 (Gilman Decl.) ¶¶ 10- 13, along with the parties' disclosures under Fed. R. Civ. P. 26(a)(1)(A) of witnesses who *may* have discoverable information, *see* Dkt. 38 exs. 1 & 2—are far too general to satisfy UBS's obligations.  UBS's averments fail to show that the live testimony of all or even the majority of the personnel and clients it references is "material," *Tel. Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 383 (S.D.N.Y. 2003), "crucial," *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir. 1998), or "key," *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003), to resolving this case on the merits, let

alone that the expense of producing those witnesses whose live testimony will be material

renders Bloomberg's "chosen forum . . . genuinely inconvenient and [the UK] significantly

preferable," *Iragorri*, 274 F.3d at 74-75.  Nor has UBS identified any witness whose live

testimony is critical who would be unwilling to come to New York for trial.  UBS's "[b]are

allegations" on this point "are insufficient to tip the balance of convenience in [its] favor."

*Mendes*, 15 F. Supp. 2d at 339.

UBS also makes passing references to the existence of documents in the United Kingdom

that bear on the parties' contractual obligations and any alleged breach.  *See* Dkt. 19 (FNC Mot.)

at 6; Dkt. 37 (UBS Reply) at 2-3.  The Court is skeptical of UBS's assertion "that *all* that

informs a determination of breach—both witnesses and documents—is located in England," Dkt.

37 (UBS Reply) at 2-3 (emphasis added), given that Bloomberg's principal place of business is

in New York City, *see* Dkt. 1 (Compl.) ¶ 12.  But even if UBS is correct, "technological

advances have minimized the burden of transporting documentary evidence," *Tel. Sys. Int'l, Inc.*,

303 F. Supp. 2d at 383 (citation omitted), and UBS has made no showing that any unique

logistical concerns exist in this case that would make producing documents for use in this Court

more onerous than if they were stored in the United States, let alone that those concerns are

sufficient to make proceeding in this forum "genuinely inconvenient" and proceeding in the UK

"significantly preferable," *Iragorri*, 274 F.3d at 74-75.  On the whole, then, UBS has not

satisfied its burden of demonstrating that the private-interest factors favor proceeding in the

United Kingdom.

The same goes for the public-interest factors, as to which UBS does not even comment.

The public's interest "in having the case decided in the jurisdiction whose law will govern the

case," *Mayer*, 2018 WL 1738322, at *3, and by a tribunal experienced in interpreting and

applying New York law favors keeping this action in this Court.  Nor would litigation in this district of a case involving a major New York company impose an undue burden on the court or any jury.  *Id.*

In short, UBS has failed to show that Bloomberg's "chosen forum is . . . genuinely inconvenient and [the UK] significantly preferable," *Iragorri*, 274 F.3d at 74-75.  Accordingly, its motion to dismiss this case on grounds of *forum non conveniens* is denied.

## II.    UBS's Motion to Dismiss Counts I, II and IV for Failure to State Claims and Lack of Standing

UBS has moved to dismiss Counts I and II of Bloomberg's complaint for failure to state claims under Fed. R. Civ. P. 12(b)(6) and to dismiss Count IV both for failure to state a claim and for lack of Article III standing under Fed. R. Civ. P. 12(b)(1).  Both motions are denied.

### A.  Counts I and II State Claims for Breach of Contract

To state a breach-of-contract claim under New York law, Bloomberg must plausibly plead "(1) the existence of a contract, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages resulting from the breach." *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010).  UBS's motion to dismiss focuses on whether Bloomberg has plausibly pleaded the third and fourth of these elements; it does not question the existence of valid contracts or that Bloomberg has adequately performed the contracts.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  When considering a Rule 12(b)(6) motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.

*See Gibbons*, 703 F.3d at 599.  "[T]o survive a motion under Rule 12(b)(6), a complaint does not

need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an

entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64,

70 (2d Cir. 2014) (citation omitted).

      1.   UBS's Challenge to Count I

      Count I of the complaint states a claim for breach of contract based on UBS's

unauthorized redistribution of Bloomberg's proprietary data to UBS Delta clients.

      Section 4 of the Global Agreements authorizes UBS to use Bloomberg's data "solely for

its internal use and benefit and not for resale or other transfer or disposition to, or use by or for

the benefit of, any other person or entity . . . ."  Dkt. 1 (Compl.) ex. 1 § 4, ex. 2 § 4.  A proviso to

that clause, however, permits UBS, "as part of and in the ordinary course of its business and to

support the primary business . . . ," to "use and disseminate to its customers and prospective

customers a limited amount of Data directly related to the type and extent of the customer

relationship," including "Resultant Data" springing from UBS calculations using Bloomberg's

data as inputs.  *Id.*  In exercising the right granted by this proviso, (1) UBS must "not use or

disseminate the Data in any way which could cause the information so used or disseminated, in

[Bloomberg's] sole good faith judgment, to be a source of or substitute for the Data otherwise"

obtainable only through a Bloomberg subscription; (2) "the Data contained in the Resultant Data

[may] not, in [Bloomberg's] sole judgment, remain identifiable and may not be readily

extracted"; and (3) UBS may "not use, transfer, distribute or dispose of the Data or Resultant

Data in any manner that could compete" with Bloomberg's business.  *Id.*  Another clause in

Section 4 specifies "that the rights granted to [UBS] under th[ese] Agreement[s] do not include

the right to store all or any part of the Data in databases for access by any third party or to

distribute any database services containing all or part of such Data," except that UBS "may, for its internal use only, store the Data . . . ."  *Id.*  Finally, Section 6 of the Agreements specifies "that the dissemination or distribution by [UBS] of information identical or similar to [Bloomberg's] Data and from which dissemination or distribution [UBS] derives or may derive commercial revenue shall be deemed a breach" of Section 4.  *Id.* § 6.

Paragraph 8 of the parties' 2005 Addendum to the Global Agreements added a new sentence to Section 4 of the original Agreements.  The new sentence provides that UBS may use specific types of data, identified on an attachment labeled Exhibit C, "within certain [UBS]-developed applications"—including, as is relevant here, UBS Delta—that are "designed to facilitate transactions" between UBS and its customers.  Dkt. 1 (Compl.) ex. 3 ¶ 8.  Like the parties' original Global Agreements, however, this addendum provides that UBS "may not use or disseminate such Data in any way which could, as determined in [Bloomberg's] sole good faith discretion, either (i) cause the information so used or distributed to be used as a source of or substitute for the Data otherwise" obtainable only through a Bloomberg subscription or "(ii) compete with the business of" Bloomberg or its affiliates.  *Id.*  Paragraph 10 of the Addendum specifies that UBS is permitted to insert hyperlinks into UBS Delta that, if clicked, will bring UBS Delta users who subscribe to Bloomberg to the Exhibit C data on Bloomberg's own subscription service.  *Id.* ¶ 10.

The first count of Bloomberg's complaint plausibly asserts that UBS has breached these provisions.  Bloomberg's complaint alleges that UBS personnel acknowledged that UBS Delta clients "are able to extract [their UBS Delta] portfolio information on the screen, via pdf or excel," and that, although clients "cannot download the datasets associated with the calculations per se (i.e., the inputs)," they can see "the end result which is a blend of data from various

Market data suppliers and UBS data sets (including Bloomberg—for example pricing data for a bond comes from Reuters and reference data such as the Coupon comes from Bloomberg)."  Dkt. 1 (Compl.) ¶ 53.

As Bloomberg's complaint explains, Dkt. 1 (Compl.) ¶ 54, if that "reference data" includes information that Bloomberg provided to UBS pursuant to Exhibit C of the 2005 Addendum, then UBS's creation of an application permitting UBS clients to "extract" "a blend of data" containing that reference data would be a three-fold breach of the parties' Agreements. First, it would run afoul of the prohibition in Section 4 of the Global Agreements on UBS using or disseminating Bloomberg's data "in any way which could cause the information so used or disseminated . . . to be a source of or substitute for the Data otherwise" obtainable only through a Bloomberg subscription.[3]  Dkt. 1 (Compl.) ex. 1 § 4, ex. 2 § 4; *see also id.* ex. 3 ¶ 8.  Second, it would trigger the Global Agreements' provision "that the dissemination or distribution by [UBS] of information identical or similar to [Bloomberg's] Data and from which dissemination or distribution [UBS] derives or may derive commercial revenue shall be deemed a breach" of Section 4.  *Id.* ex. 1 § 6, ex. 2 § 6.  And third, it would contravene another clause of Section 4 of the Global Agreements barring UBS from "stor[ing] all or any part of [Bloomberg's] Data in databases for access by any third party or to distribute any database services containing all or part of such Data . . . ."  *Id.* § 4.

According to the complaint, Bloomberg's audit confirmed that UBS Delta does, in fact, enable UBS clients to download Bloomberg data in violation of the above provisions.  A UBS

---

[3]      It is hardly implausible, contrary to UBS's suggestion, *see* Dkt. 22 (Mem. in Supp. of Mot. to Dismiss Counts I, II, and IV) at 12-13, that enabling UBS clients to extract data containing Bloomberg-provided reference data could obviate those clients' need to buy that data directly from Bloomberg: drawing all inferences in Bloomberg's favor, it would be economically senseless for a UBS client to buy a Bloomberg subscription to get data already available through UBS Delta.

demonstration of the application confirmed that "the UBS Delta service did in fact allow UBS clients to access and export proprietary Bloomberg data, *regardless of whether the UBS client itself had a Bloomberg data license covering the data in question*," and that "UBS Delta clients could access and download Bloomberg reference data associated not just with those users' actual portfolio holdings, but with the *entire universe* of Bloomberg reference data made available to UBS under Section 8 of the 2005 Addendum."  Dkt. 1 (Compl.) ¶ 67-68 (first emphasis added). Taking these specific allegations as true, Bloomberg's first count plausibly pleads a breach of contract.

UBS's primary counterargument is that the 2005 Second Addendum specifically permitted UBS to allow its clients to extract Bloomberg's proprietary reference data.  Dkt. 22 (Mem. in Supp. of Mot. to Dismiss Counts I, II, and IV) (hereafter, "12(b) Mot.") at 8-13; *see also* Dkt. 37 (UBS Reply) at 5 ("[T]he very terms of the Agreements . . . ***expressly permit*** access to and distribution of Bloomberg data.").  In support of its argument, UBS points to Paragraph 8 of the 2005 Addendum, which provides that UBS "may use the Data elements set forth on Exhibit C within certain [UBS]-developed applications"—including UBS Delta—"whereas such . . . Applications are designed to facilitate transactions with" UBS.  Dkt. 22 (12(b) Mot.) at 9-10 (citing Dkt. 1 (Compl.) ex. 3 ¶ 8).  It is unclear, however, how that language authorized UBS to deliver Bloomberg's proprietary data to UBS's clients in a format in which those clients could download or otherwise extract the data at will, as Bloomberg specifically alleges.  *See* Dkt. 1 (Compl.) ¶¶ 52-53, 67-68.  Indeed, Paragraph 8's text cuts exactly the other way, authorizing UBS to use the Exhibit C data "within" UBS Delta and not in a way that would either (1) obviate the need for UBS Delta clients to subscribe to Bloomberg directly or (2) cause UBS Delta to compete with Bloomberg's data-subscription business.  Dkt. 1 (Compl.) ex. 3 ¶ 8.  Authorizing

UBS Delta clients to download Bloomberg's data—including not only "reference data associated . . . with those users' actual portfolio holdings," but also "the *entire universe* of Bloomberg reference data made available to UBS under Section 8 of the 2005 Addendum," *id.* ¶ 68—goes well beyond using the data "within" UBS Delta to facilitate transactions with UBS, as Paragraph 8 of the 2005 Addendum permits.[4]

UBS also points to Paragraphs 10 and 11 of the 2005 Addendum in support of its argument that the 2005 Addendum authorized the alleged data redistribution on which Count I is premised. Paragraph 11 requires UBS to "obtain and maintain all necessary approvals, consents and authorizations required for the use, distribution, and dissemination of the Licensee Applications and the Data from Exhibit C as contemplated by this Second Addendum, including, but not limited to, any necessary licenses from any third parties for third party data." Dkt. 1 (Compl.) ex. 3 ¶ 11. Paragraph 10 authorizes UBS to "insert hyperlinks to the Bloomberg Professional® Service" "within" UBS Delta. *Id.* ¶ 10. UBS asserts that these provisions would be superfluous "if it was not intended by the parties that the Exhibit C Data would be visible and potentially distributed to external clients of UBS Delta." Dkt. 22 (12(b) Mot.) at 10-11.

The Court disagrees. Paragraph 11's phrase "as contemplated by this Second Addendum" suggests that it was not an affirmative grant of data-distribution rights but instead simply a common-sense obligation imposed on UBS to maintain necessary approvals to protect Bloomberg (and UBS, for that matter) from third-party claims relating to UBS's distribution of

---

[4]      Contrary to UBS's argument, Bloomberg's complaint does not "suggest that Bloomberg granted UBS the right to use the Exhibit C data in applications designed to facilitate securities transactions between UBS and its clients but provided no access or visibility to the Exhibit C Data to those very same clients." Dkt. 22 (12(b) Mot.) at 9-10. Bloomberg acknowledges that the parties' agreements authorized UBS to permit UBS's clients *some* access to the Exhibit C data. *See* Dkt. 32 (Mem. in Opp. to UBS Mots.) at 17. It contends, however, that the *extent* of that access—specifically, the ability to download the entire universe of Exhibit C data at will, according to Bloomberg's complaint—was not permitted. *See id.* ("[T]he Agreements *do* allow access . . . But the Agreements certainly do not allow *redistribution* of Bloomberg's data through UBS Delta."). For the reasons already discussed, Bloomberg's contention is sufficiently plausible to survive UBS's motion to dismiss.

the UBS Delta application and, as used within that application, Bloomberg's proprietary

reference data.  It would make little sense for the parties to have further commented on UBS's

new rights under the 2005 Addendum in Paragraph 11 when they had already laid out the scope

of those rights in detail in Section 4 of the Global Agreements, as amended by Paragraph 8 of the

2005 Addendum.  *See, e.g.*, *Blackmon v. Estate of Battcock*, 587 N.E.2d 280, 285 (N.Y. 1991)

("[T]he aim of contract interpretation is not simply mechanical application of the literal language

of an agreement, but also consideration of what may reasonably be implied from that language in

effectuating the parties' purpose in entering the contract.").[5]

     As for Paragraph 10—the part allowing UBS to insert hyperlinks to Bloomberg's

subscription website within UBS Delta—UBS fails to explain how the inclusion of a provision

authorizing UBS to hyperlink its customers to the source of its reference data undermines, rather

than supports, Bloomberg's theory that the 2005 Addendum did not permit UBS to directly

redistribute that reference data, in downloadable format, to its customers.  If Paragraph 8 of the

Addendum authorized UBS to hand out Bloomberg's reference data to UBS customers willy-

nilly, as Bloomberg alleges UBS has done, then it would make little sense for the parties to

provide for hyperlinks to the same data through Bloomberg's paywalled subscription service:

UBS's clients would have little reason, if any, to ever use the hyperlinks and a great deal of

financial incentive *not* to use them.  *See, e.g.*, *Two Guys From Harrison-N.Y., Inc. v. S.F.R.*

---

[5]     In its reply brief, UBS asserts that it is not arguing "that Paragraph 11 alone grants distribution rights but rather that its express statement of the parties' intentions—within the very document that grants the license—further confirms that the license provided by Paragraph 8 covers both the use and distribution of the Exhibit C data in connection with the UBS Delta product."  Dkt. 37 (UBS Reply) at 7.  The Court cannot agree that, *as a matter of law*, Paragraph 11 "confirms" that Paragraph 8 of the 2005 Addendum authorized UBS's alleged (mis)use of Bloomberg's data.  Even if UBS's argument may ultimately prove to be correct, it does not entitle it to dismissal of Count I at this stage of the litigation.

*Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").[6]

Thus, the Court must reject UBS's argument that the text of the parties' Agreements precludes Count I of Bloomberg's complaint as a matter of law.

2. UBS's Challenge to Count II

Count II also states a plausible claim for breach of contract based on UBS's alleged unauthorized use of Bloomberg's proprietary data to compete with Bloomberg.

As a refresher, although Section 4 of the Global Agreements authorizes UBS to "use and disseminate to its customers and prospective customers a limited amount of Data directly related to the type and extent of the customer relationship," that section also expressly prohibits UBS from using, transferring, distributing or disposing of the Data or Resultant Data "in any manner that could compete" with Bloomberg's business. Dkt. 1 (Compl.) ex. 1 § 4, ex. 2 § 4. Paragraph 8 of the 2005 Addendum—which modified Section 4 to permit UBS to use Exhibit C data "within" UBS Delta—similarly specifies that UBS "may not use or disseminate such Data in any way which could, as determined in [Bloomberg's] sole good faith discretion, . . . compete with the business of" Bloomberg or its affiliates. Dkt. 1 (Compl.) ex. 3 ¶ 8. Bloomberg's second cause of action asserts that "[b]y charging UBS customers to access a system that allows the

---

[6]     Quoting from the parties' agreements, UBS suggests that because neither it nor its UBS Delta product "is a 'source of or substitute for' Bloomberg," Dkt. 22 (12(b) Mot.) at 12-13 (quoting Dkt. 1 (Compl.) ex. 1 § 4, ex. 2 § 4, ex. 3 ¶ 8), "UBS's use of the limited Exhibit C Data within its UBS Delta application, including to the extent such data is visible to or distributed to UBS Delta clients, cannot be a breach of the Global Agreements," *id.* at 13; *see also* Dkt. 37 (UBS Reply) at 7-8 ("[T]he mere ability to export data from the UBS Delta product, even to the extent it includes incidental reference data from Bloomberg and/or other data providers, does not transform UBS or UBS Delta into a market data provider in competition with Bloomberg."). This is a red herring. The clause UBS cites does not prohibit UBS or UBS Delta from becoming a substitute for Bloomberg itself; it prohibits UBS from using or distributing Bloomberg's data in a way that could cause UBS Delta or UBS's other products and services to displace a UBS client's need to subscribe to Bloomberg's data services directly. Bloomberg no doubt agrees that UBS and its products are no substitute for Bloomberg. But one way Bloomberg can prevent a licensee and its products from ever becoming such a substitute is to tightly limit the licensee's authority to redistribute Bloomberg's data. Bloomberg's complaint offers specific, factual allegations that, if true, show that UBS has exceeded exactly those sorts of limitations.

downloading of proprietary Bloomberg data, UBS has effectively competed with Bloomberg's data licensing business" in violation of these non-compete provisions.  *Id.* ¶¶ 95-97.  This theory is quite plausible: as noted, *see supra* n.3, drawing all inferences in Bloomberg's favor, a UBS client who can download "the entire universe of Bloomberg reference data made available to UBS under Section 8 of the 2005 Addendum," *Id.* ¶ 68 (emphasis added), has little reason to pay for a separate subscription to receive that data directly from Bloomberg.  If that is not competition, then it is unclear what is.

UBS argues that Bloomberg has not alleged "that customers of UBS Delta have been accessing and downloading the limited Exhibit C Data in such a manner as to render their Bloomberg subscriptions (if any) obsolete."  Dkt. 22 (12(b) Mot.) at 12.  This counterargument misses the point: the text of both the Global Agreements and the 2005 Addendum prohibits any use or distribution of Bloomberg's data that *could* compete with Bloomberg's business, not just use or distribution that is proven to have caused successful competition.  Drawing all inferences in Bloomberg's favor, it is plausible that permitting UBS Delta users to download Bloomberg's proprietary data at will creates the risk that those users will opt not to subscribe directly to Bloomberg, thereby undermining Bloomberg's data-subscription service.[7]

UBS also challenges a second theory of breach underlying Count II: that UBS Delta competes with Bloomberg's "PORT+" product in violation of the parties' agreements because UBS Delta uses Bloomberg's proprietary data to "allow[] users to analyze various risk metrics and generate organizational-level reports"—functionalities that Bloomberg's PORT+ application

---

[7]    At trial, Bloomberg will, of course, need to offer proof of damages to succeed on Count II.  *See Rex Med. L.P.*, 754 F. Supp. 2d at 623.  At this stage, however, it "need only plead allegations from which damages attributable to defendant's breach might be reasonably inferred."  *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-CV-9687, 2016 WL 4916969, at *6 (S.D.N.Y. Feb. 11, 2016) (citations and alterations omitted).  Given the value of Bloomberg's proprietary data and the cost of a Bloomberg subscription, it is more than reasonable to infer that UBS's alleged redistribution of Bloomberg's data through UBS Delta in violation of the parties' agreements caused damage to Bloomberg in the form of at least some lost subscription fees.

also provides.  Dkt. 1 (Compl.) ¶¶ 98-100.  UBS argues, *see* Dkt. 22 (12(b) Mot.) at 13, that this theory of breach must be rejected as a matter of law because the Global Agreements permit UBS to compete with Bloomberg in a business "in which [Bloomberg] was not engaged on the initial date of [the] Agreement[s]" and in which UBS "was engaged on the initial date of [the] Agreement[s]," Dkt. 1 (Compl.) ex. 1 § 4, ex. 2 § 4.  A factual question, however, precludes the Court from dismissing Count II's PORT+ theory on this basis: Bloomberg's complaint does not allege when either party began operating their PORT+ and UBS Delta applications, details essential to assessing whether the safe-harbor provision UBS cites is applicable to UBS Delta. And, in any event, UBS's interpretation of that provision leaves out a key limitation on any right UBS may have had to compete with PORT+: even if Bloomberg was not operating PORT+ on September 28, 1998, when the Global Agreements were first ratified, and even if UBS was operating UBS Delta (or a predecessor product) on that date, as UBS contends, the safe-harbor provision authorized UBS to compete with Bloomberg's PORT+ application only "for the remaining term of [the] Agreement[s]," "not including renewals."  *Id.* ex. 1 § 4, ex. 2 § 4.  Under Section 2 of the Agreements, the Agreements' first term expired on September 28, 2000.  *Id.* § 2. Any competition after that date, therefore, was not within the safe harbor.[8]

---

[8]     Like Bloomberg, the Court is uncertain why UBS interprets Count II as "tak[ing] issue with UBS's use and distribution of 'Resultant Data'" specifically, as opposed to Bloomberg's data more generally.  *See* Dkt. 22 (12(b) Mot.) at 13.  Count II alleges that "[b]y charging UBS customers to access a system that allows the downloading of proprietary Bloomberg *data*, UBS has effectively competed with Bloomberg's data licensing business in violation of" the Global Agreements and the 2005 Addendum.  Dkt. 1 (Compl.) ¶ 97 (emphasis added).  It furthermore alleges that "[b]y using the *data* licensed under the Global Agreements in UBS Delta, UBS has . . . used that data in a manner that competes with [Bloomberg's] business . . . , in violation of the Global Agreements as amended by the 2005 Addendum."  *Id.* ¶ 100 (emphasis added).  UBS's argument appears to misinterpret Bloomberg's complaint, so the Court rejects it.

In its reply, UBS asserts that it "focuses on the contract provisions relating to Resultant Data because that is the focus of Bloomberg's allegations with regard to PORT+," citing paragraph ninety-nine of the complaint.  Dkt. 37 (UBS Reply) at 8.  UBS does not justify its assertion, however, that the kinds of data to which Bloomberg refers in that paragraph are "Resultant Data" that are not subject to the agreements' general prohibitions on using Bloomberg's data in ways that could compete with Bloomberg.  UBS's argument therefore is not persuasive.

Therefore, the Court rejects UBS's assertion that the text of the parties' Agreements precludes Count II of Bloomberg's complaint as a matter of law.

B.   Count IV Adequately Alleges Standing and States a Claim for Breach of Contract

Count IV of Bloomberg's complaint adequately alleges Article III standing and plausibly pleads a claim for breach of contract premised on UBS's alleged unauthorized exposure of Bloomberg's data to competing data vendors.

In considering a facial motion to dismiss under Rule 12(b)(1), the Court must "determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) (citations and alterations omitted).  The Court must "accept . . . as true all material factual allegations of the complaint . . . and draw . . . all reasonable inferences in favor of the plaintiff." *Id.* at 57 (citations and alterations omitted).  The party invoking federal jurisdiction—here, Bloomberg—must plausibly plead (1) an "injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is "a causal connection between the injury and the conduct complained of," i.e., that the injury is "fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations, internal quotation marks, and alterations omitted).

Addressing first whether Count IV adequately establishes Article III standing, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998), the Court concludes that it does.  "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is

a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). Here, Bloomberg alleges that despite a February 2018 demand that UBS "cease and desist sharing, making available, and/or allowing access to current and historical Bloomberg data by any third party, and that UBS ensure that all such third parties delete and purge any such Bloomberg data," "UBS has refused to confirm that it has complied with these demands" and announced in July 2018 that it would "migrat[e] UBS Delta to a different data provider" by August 2018. Dkt. 1 (Compl.) ¶¶ 114-16. Bloomberg further alleges that absent appropriate safeguards, like the purging of Bloomberg's data from UBS Delta, the process of migrating UBS Delta to another data provider will likely expose its data to use by that new data provider, thereby violating Section 4 of the Global Agreements. *Id.* ¶¶ 74-83, 113-21; *see also id.* ex. 1 § 4, ex. 2 § 4 ("In no event will [UBS] permit the Data to be used in any way not specifically authorized by [Bloomberg] or distributed, published, copied, broadcasted, reproduced, ported, or otherwise routed to any third party in any way not authorized herein."). Given UBS's refusal to confirm or deny whether it has purged or otherwise safeguarded Bloomberg's proprietary data from UBS's alternate data provider, and in light of the potential value of that data to competing data providers,[9] drawing all inferences in Bloomberg's favor, Bloomberg has pleaded a "substantial risk that the harm" it fears "will occur," *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted). That injury, the unauthorized exposure and exploitation of Bloomberg's proprietary data to and by a competing data provider, would be fairly traceable to UBS's conduct: but for UBS's failure to safeguard Bloomberg's data, no unauthorized redistributions of that data to UBS's alternate data provider could occur.

---

[9]     UBS paid Bloomberg $300,000 annually just for a limited right to use the data set forth in Exhibit C to the 2005 Addendum. *See* Dkt. 1 (Compl.) ex. 3 ¶ 8. It is reasonable to infer that an even broader swath of Bloomberg's historical and current data would be even more valuable to a competing data provider.

*Lujan*, 504 U.S. at 560-61.  And, finally, it could be redressed by an order from this Court

directing UBS to, for instance, immediately delete all Bloomberg data in its possession.  *Id.*

Count IV of Bloomberg's complaint, therefore, adequately alleges Article III standing.[10]

UBS also asserts that Count IV fails to state a claim for breach of contract but offers very

little argument in support of that assertion.  As the Court has explained, if UBS has allowed

Bloomberg's data to be exposed to use by a competing data provider, it has directly violated

Section 4 of the Global Agreements.  *See also* Dkt. 1 (Compl.) ex. 1 § 4, ex. 2 § 4 ("In no event

will [UBS] permit the Data to be used in any way not specifically authorized by [Bloomberg] or

distributed, published, copied, broadcasted, reproduced, ported, *or otherwise routed to any third*

*party in any way not authorized herein*." (emphasis added)).  Given UBS's alleged refusal to

confirm or deny whether it has safeguarded against such exposure, it is reasonable to infer at this

stage of the litigation that it has not done so.

UBS's alleged refusal to confirm whether it is purging or otherwise safeguarding

Bloomberg's data from competing data providers, along with Bloomberg's detailed explanation

of how and why exposure of its data to those providers will immediately damage Bloomberg's

---

[10]     Bloomberg advises that it is "prepared to submit a declaration identifying additional facts that Bloomberg has learned since filing its Complaint on July 12, 2018" that might further establish Article III standing. Dkt. 32 (Mem. in Opp. to UBS Mots.) at 25 n.21.  Because the Court holds that Count IV adequately pleads standing by itself, consideration of Bloomberg's proposed declaration is unnecessary.  Bloomberg remains free, of course, to submit evidence of the facts contained in its declaration at later stages of this litigation.  Because Bloomberg's evidentiary burden will increase at each stage, it may be advisable for it to do so.  *See Lujan*, 504 U.S. at 561 ("In response to a summary judgment motion . . . the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." (citations and internal quotation marks omitted)).

          In this connection, the Court rejects UBS's assertion that Count IV fails to establish standing because "despite its ongoing monitoring" of UBS Delta's transition to an alternate data provider, "Bloomberg has yet to point to a single instance of UBS disclosing Bloomberg data to a competing market data provider."  Dkt. 37 (UBS Reply) at 10.  Because UBS's challenge to Count IV is a "facial" one—that is, "based solely on the allegations of the complaint or the complaint and exhibits attached to it"—Bloomberg "has no evidentiary burden" at this stage, and the Court must "determine whether the [Complaint alone] alleges facts that affirmatively and plausibly suggest that [Bloomberg] has standing to sue."  *Carter*, 822 F.3d at 56 (citations and alterations omitted).

business interests, *see* Dkt. 1 (Compl.) ¶¶ 75-83, 114-21, separates this case from those on which

UBS relies.  Contrary to UBS's contention, Count IV is not premised on a threadbare allegation

that because UBS has allegedly violated the parties' agreements in the past, it will continue to do

so in the future.  *See* Dkt. 22 (12(b) Mot.) at 14-15 (citing *Toto, Inc. v. Sony Music Entm't*, No.

12-CV-1434, 2012 WL 6136365, at \*13 n.23 (S.D.N.Y. Dec. 11, 2012)); *see also* Dkt. 37 (UBS

Reply) at 9-10 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Connecticut v.*

*Massachusetts*, 282 U.S. 660, 674 (1931); *Advanced Glob. Tech., LLC v. XM Satellite Radio,*

*Inc.*, No. 07-CV-3654, 2007 WL 3196208, at \*3 (S.D.N.Y. Oct. 29, 2007)).  Count IV is based

on specific factual allegations that, if true, establish a substantial risk of imminent, concrete

contractual injury.

Therefore, the Court denies UBS's motion to dismiss Count IV.

## CONCLUSION

For the foregoing reasons, UBS's motion to dismiss this case on *forum non conveniens*

grounds [Dkt. 18] is DENIED.  UBS's motion to dismiss Counts I, II, and IV [Dkt. 21] is

DENIED.  The Clerk of Court is respectfully directed to terminate the open motions at docket

entries 18 and 21.

All discovery deadlines remain as presently set.  The parties are reminded that the Court

is happy to refer them to the assigned Magistrate Judge for a settlement conference upon a joint

request.

**SO ORDERED.**

**Date:  December 19, 2018**
**      New York, New York**

**VALERIE CAPRONI**
**United States District Judge**